[EDITOR'S NOTE: This case is unpublished as indicated by the issuing court.]
MEMORANDUM OF DECISION
On May 21, 1992, more than thirty months after being placed in the custody of the Department of Children and Youth Services (DCYS), Princess J., Resa J., and James J. Jr., all children of Theresa J., and the latter two the children of James J. Sr., became the subjects of petitions seeking to terminate their parents' rights so that they might secure permanent homes through adoption after spending half their lives as foster children.
The petitioner alleges abandonment by the mother and, as to both parents, all of the other nonconsensual grounds for terminating parental rights as provided by subsection (b) of 17a-112 of the Conn. Gen. Statutes. (Rev 1991) applicable to children previously found to have been neglected and uncared for: Failure to rehabilitate; denial of necessary care, guidance or control by acts of parental commission or omission; and the absence of parent-child relationship, as defined by the statute, under circumstances where the allowance of further time to CT Page 4936 re-establish such relationship would be detrimental to the children's best interests.
Both parents appeared at the initial hearing on June 20, 1991, in response to confirmed service, each accompanied by the same court-appointed attorney who had represented them through multiple hearings in the same court for more than two years. Denials were entered on behalf of both parents and the matter set for a review in court following receipt of clinical evaluations ordered earlier in connection with the father's pending motion for unsupervised visitation. A trial date certain was set and agreed upon by all parties. At the time of a pre-trial judicial review a month before trial, counsel for the father made an oral motion to withdraw, having been "fired by her client. When the court observed that he had been adequately represented for over two years, counsel asked leave to withdraw nonetheless because her client had not permitted her call witnesses whom she sought to testify on his behalf. Her motion was granted, a second attorney was ordered to be secured for James Sr., and the trial date cancelled nisi.
On October 3, 1991, the court, suo moto, upon being informed of the stalled litigation, ordered another review in court to clarify representation of the father — whether he was pro se or, if eligible for court-appointed counsel, whether the second attorney appointed for him was to act as legal adviser to a pro se litigant or as counsel of record. On October 23, 1991, with all parties except the mother in court, it was determined that James Sr., would act pro se and that the second attorney was to act as adviser only. As a pro se litigant, James Sr. was to be provided with all clinical evaluations pertaining to himself and his children. At a subsequent pretrial conference, after the second attorney indicated that James Sr. had declined his services as adviser, James Sr. made clear his desire to have access to the whole case file, including all psychological reports of all parties. In a subsequent hearing on motion of the mother's counsel for a protective order denying the father access to clinical materials not specifically pertaining to him, his two children, or their interrelationship, James Sr. indicated he was not willing to be represented by court-appointed counsel. The court then ordered appointment of a third attorney for the father, indicating this to be the last such order in this case. The mother's motion, not needed if the father were represented by counsel, was marked off. Trial dates certain were set in January to accommodate the father's afternoon working schedule, with evidence pertaining to Princess to be offered only at times when the father would not be present. Prior to the first trial day, however, the third attorney filed a motion to withdraw that was granted with the father's agreement. Once again James Sr. asserted his right as a pro se CT Page 4937 litigant to examine copies of clinical materials relating to him and his children. These were provided on the first trial day, January 22, 1992. On motion of the children's counsel, a transcript of testimony at the original neglect trial on November 16, 1988 was made a part of the record in this case. Trial was conducted during portions of six trial days with testimony concerning Princess given in the absence of James Sr. On March 19, 1992 all parties rested and waived any right to file trial memoranda.
Since no amendment to the original petition was filed, the adjudicator date remains the date of filing, May 21, 1991 — eight months before commencement of trial. The dispositional date is March 19, 1992 which also constitutes the date upon which the period of reserved decision commences.
FACTS
Testimony and exhibits offered at trial, interpreted in the light of the prior court record concerning these children and the respondent parents, of which judicial notice is taken, supports the finding of the following facts:
Theresa married James Sr. a month after giving birth to Princess in March of 1985. Theresa had just turned 19 and James Sr. was in his early thirties at the time. Following their marriage, Theresa became a substance abuser, and in the year before the birth of their twins, Resa and James Jr. on January 24, 1987, a teen-aged daughter of James Sr. by a previous relationship reported to DCYS and the police that she had been sexually abused by her father for over five years. Notwithstanding this revelation, when the twins were six months old, James Sr. was awarded their sole custody in a Probate Court proceeding in which Theresa was initially not represented by counsel. By her own admission, at that time Theresa was heavily addicted to cocaine and only intermittently able to care for her children. James Sr. represented himself to be Princess's father in the Probate proceeding and in all proceedings in this court until blood tests definitely ruled him out on August 16, 1990.
In November of 1988, six months after James Sr. obtained custody of the three children in the Probate Court, the police were called to investigate a report that children aged one and three were left locked in an apartment unattended. Investigating police officers found Princess, clad only in a shirt, caring for her year old twin half-siblings. Princess reported that "Daddy left to go the store, or something."
(Testimony of Officer John Vivo, November 16, 1992: transcript P-3). CT Page 4938
 . . .there was a very bad odor in the apartment. The kids were all full of vomit. They had defacated in the apartment. . . one of the twins was eating a piece of bread with mold on it (Id). . . There was vomit all over them, all over the mattresses. There was no beds. Clothes all over the place. There was roaches. It was infested with roaches. They had a heater in there that if the kids touched it, they would've gotten burned. (Id. p. 4) . . . the apartment was a total mess. The kids were infested with feces. I had — at one time I had to leave because I just — I couldn't hold it no more. My stomach was getting weak. . . One of `em had a T-shirt and the other two were naked. (Id. p. 5.)
The fire department came and disconnected the heater which was found to be a hazard. The officers were in the apartment between three and three and one-half hours during which the father did not appear despite inquiries made in neighborhoods he was known to frequent. (Id. p. 8.) A fire department investigator, Andrew Farraday, found all three children ". . . covered with human feces and they were eating stale bread. I also noted that the chairs in the kitchen were covered with human feces and the apartment was loaded with garbage." (Id. p. 14) Witness Farraday added:
 In the twenty-one years that I've been on the Fire Department, fifteen of them on the rescue squad and six on the arson squad, I have never seen people living under the conditions that I saw in this apartment. (Id. p. 15-16.)
Police officer John Kueto described two heating devices: a gas stove with flames on top and the oven on; a three-by-three foot gas heater on the floor, also on (Id. p. 18). This witness described the sleeping conditions: "There were mattresses that were also covered with fecal matter and vomit. The bathroom wasn't functional." (Id. p. 20.) He also observed drug paraphenalia on a table: "Crack pipes and ashes, foil, matches. . ." (Id.) The aunt who had witnessed these conditions testified on February 6, 1992, from her personal experience, that they were chronic at the time.
DCYS, upon confirming these reports, placed the children in CT Page 4939 foster homes under an order of temporary custody. Letters and notices were sent to the home, and a copy of the administrative authorization for placing the children left on the door, but "We did not hear from Mr. J. for approximately one month afterwards." (Testimony of DCYS social worker Kirkland, Id. p. 29.) When he did make himself known to DCYS, he revealed that he had returned to the apartment, seen police and fire department vehicles present, and had hidden in the bushes to avoid being arrested. (Id. p. 30.) Theresa contacted DCYS two weeks thereafter, reporting that she had been in detox in New York at the time. (Id. p. 31.)
Fourteen months after securing temporary custody, the children were found to have been neglected, a second man who had appeared asserting paternity of Princess had been eliminated by blood testing (State's Exhibit 2, January 2, 1990), and the children were committed to DCYS for an initial period of 18 months, the long-range plan being to return to the custody of the parents if they corrected the circumstances that led to the commitment.
Although the statute (subsection (g) of 46b-129) prohibits a parent from seeking revocation of commitment within six months following an order of commitment, this court entertained the father's motion to revoke custody filed just two months after the commitment date of January 2, 1990. On July 3, 1990, after a fully contested hearing, the court denied the father's motion for revocation, but continued his motion for overnight visitation, which had also been filed months earlier, in order to obtain an evaluation of alleged sexual abuse of Princess, and, possibly the twins, suggested in both psychological and developmental evaluations secured during the preceding year.
Two months later, on September 11, 1990, James Sr. filed his second petition for revocation. Again, this court entertained his petition, notwithstanding the language of subsection (g) of 46b-129:
 No hearing shall be held for such reopening and termination of commitment or transfer of commitment more often than once in six months, except upon the application of said commissioner.
On January 15, 1991, following completion of the report by a special sexual abuse counsellor from the Yale Child Study Center (State's Exhibit 3, January 10, 1991), the court again denied the father's motion to revoke. Subsequently (January 31, 1991), his request for court-ordered overnight visitation was denied, the matter being left to the discretion of DCYS. Four months CT Page 4940 later the father's third revocation petition filed in thirteen months was denied upon review by the court of the DCYS study and the Yale evaluation of the sexual abuse issue. Again, his alternative request for unsupervised visitation was continued pending receipt of still further evaluations to be conducted by Dr. Augenbraun. These were stipulated to be available in any forthcoming action for termination of parental rights. In the same month in which his third revocation petition was rejected these petitions seeking to terminate parental rights were filed.
All of the testimony offered in six trial days supports the conclusion that neither parent had made sufficient change to permit the children to be returned to their care in the foreseeable future. Theresa remained incapacitated with her own problems until her release from drug treatment, following five months of incarceration, in December of 1991 — seven months after the adjudicator date or these petitions. While claiming to have been drug free since her release, she had become pregnant by a boyfriend from whom she had recently separated and continued having no residence of her own. James Sr., while utilizing to the fullest the resources of the judicial system, evidenced no change from his situation in November of 1988 when the twins were removed from her care: He continued to deny that the conditions found on that occasion were neglectful; he acknowledged no responsibility for those conditions or for the serious developmental impact they had had upon his children; he dismissed all suggestions of sexual abuse while offering no evidence to refute the expert witnesses called by the petitioner. While he had based his three earlier unsuccessful petitions for revocation on his ostensible compliance with the requirements DCYS had set for the eventual return of the children, such compliance had ended nearly two years before the adjudicatory date for these petitions, and his own testimony makes clear that those petitions were properly denied since what compliance there was had worked no change in his understanding or attitudes.
Summary of Testimony.
— Social worker Rodney testified that between January and September of 1990, James Sr. consistently denied the children had ever been neglected, had any special needs, or had ever been exposed to sexual abuse, despite partial compliance with the requirement that he seek mental health services and work with the Ripple Program on the twins' severe developmental delays. During this same period, Theresa visited four times, but visitation was suspended in March of 1990 after she voiced threats to the physical safety of her children. She neither requested the reinstatement of visitation nor inquired as to the to the welfare of the children, and her whereabouts were unknown CT Page 4941 until January of 1991 when she appeared at a court hearing on the instant petitions.
— The twins' foster mother since their initial placement in November of 1988 testified (January 30, 1992) that on their arrival in her home they were both extremely dirty, their unwashed hair in "dreadlocks"; they were unused to wearing clothing or sleeping in garments; they had to be taught to play with, rather than destroy, their toys; they were totally non-verbal except with the foster mother; they acted out sexually, constantly at first, playing with each other's bodies, kissing, putting their hands "where they should not"; they were unusually hungry, James initially eating with his hands; both had bowel and bladder control problems until long after their placement began. Gradually, with supervision at home supplemented by educational programs outside the home, these behaviors began to subside. Their appetites reduced to normal. The sexual behaviors subsided, reappearing only after visits with their father. Visits with their mother, which had recommenced shortly before these proceedings began, did not produce this particular reaction, but after the most recent visit, during which Theresa told them that they would be leaving the foster home to come live with her, both children displayed negative reactions: Resa's asthma, which had begun when mother recommenced visiting, recurred with increasing severity necessitating hospital intervention; James became very upset, yelling and screaming uncharacteristically to the point where the foster mother reopened counselling which had ended three months earlier. The foster mother had participated in all pre-school programs with the twins from the onset of their placement, and at the time of testifying she was going to their school on a daily basis to observe and discuss their progress with their teachers.
— Dr. Weber-Chess, a pediatrician specializing in child development, testified on January 29, 1992 on evaluations conducted over a two and one-half year period. When first seen on March 8, 1989, she had found the twins' behavior "very atypical" for children of 26 months: Resa sat motionless for an hour without moving or uttering a sound. Extremely inhibited, fearful and rigid, she exhibited no developmental skills of any kind. In her four years as a developmental pediatrician, Dr. Weber-Chess had never evaluated such an atypical child. While functioning at a severely retarded range Resa did not necessarily have a diminished I.Q. Fifteen months later, on May 29, 1990, Dr. Weber-Chess found both twins still dysfunctional, extremely inhibited outside of their foster home, rigid and shaking when confronted with new situations. Reports of their sexualized behaviors, she concluded, evidenced their having been victims of sexual abuse rather than simply observers of the CT Page 4942 sexual behavior of adults. By January of 1991 she noted some improvement: Resa was much more interactive with others; James less destructive in his play. After several months of therapy, both twins were seen as "essentially normal", smiling, talkative, happy — a "dramatic change". Princess, first seen by Dr. Weber-Chess in June of 1990, was found to be low to average in intellectual functioning but highly disturbed emotionally and socially with an "attachment disorder" manifested by acting out in the home: Sexualized behavior toward younger children (undressing and fondling them) and toward adult men was accompanied by explicit sexual language, neither the behavior nor words ceasing when she was asked to stop. Attachment disorders result from having childhood needs for nurture unmet and reflect the absence of attachment for either her mother or step-father (who had claimed paternity until Princess was over five years old). This condition is hard to remediate and Princess's only hope for normal emotional growth would be to find a permanent, nurturing home where she would be permitted to become attached in a "normal fulfilling relationship" and where the setting of clear boundaries would end her propensity to perceive other people as objects.
— Dr. June Malone, psychologist, worked with Resa in August and September of 1991. She found that Resa had a warm, nurturing relationship with her foster mother of three years, and recommended that Resa be permitted to stay in that home permanently. Removal from a home where she had largely recovered from the emotional and developmental wounds from severe early deprivation would result in reopening those wounds and losing the gains she had made.
— Fay Marino, clinical social worker, in working with James from June to October of 1991, found him initially preoccupied with violence and "mean talking" father figures. His repetitive play — characteristic of much younger children — evidenced that he had been "put on hold" in his psychological development. Seeing the improvement in the four months of therapy, Ms. Marino recommended leaving James permanently in the foster home where he was "thriving" and which had succeeded in replacing his violent early role models with the normal ones of the foster home.
— Dr. Hedy Augenbraun, clinical psychologist, testified on January 30, 1992 on her evaluation of the family conducted in July and August of 1991. She found the twins at that time still "significantly" delayed. Resa, with a borderline I.Q., was largely nonverbal and so could not be fully tested; James, with an even lower I.Q., was similarly not fully testable for the same reason. Dr. Auguenbraun recommended that the twins not be removed from their present foster home where significant gains CT Page 4943 had been made over a period of three years.
Her evaluation of James Sr. was hampered by his missing both of two scheduled individual evaluation dates. Although reminded by both letter and phone call of the rescheduled appointment, his explanation was "Too many other things at stake, I can't just drop everything plus I'm not even in the right state of mind." (State's Exhibit L, p. 2.) From the partial evaluation conducted on the day of the parent-child interaction session on August 9, 1991, Dr. Augenbraun found him intensely resistant to admitting any personal shortcomings, ". . . apparently . . . inclined to view psychological problems as a sign of emotional or moral weakness." (Id.) His test results suggested "significant personality dysfunction", ". . . wish fulfillment rather than reality." He tended to deny emotional problems, avoid criticism, and, under a facade of conformity and propriety, "periodic surges of anger do break through." (Id.) In interaction with the twins, "He related warmly to the children and they showed no obvious fear of him, though both were observed to chew their lips, usually a sign of anxiety." (State's Exhibit M. p. 1) The children were observed to regard him positively and related to him as a parent, while showing "some anxiety in his presence." (Id. p. 2.) Although the psychologist had found Resa functioning at the borderline level, her lack of verbalization "highly pathological" at her age (State's Exhibit J., p. 4) and James Jr. functioning in the mildly retarded range with a "severely deficient receptive vocabulary", their father "portrays them as competent, insists that he sees no deficits in their behavior or evidence of developmental delays, and apparently rejects evidence of the delays that has been explained to him". (State's Exhibit M., p. 2.) In her testimony, the psychologist presented a diagnosis of obsessive-compulsive personality disorder with rigid, defensive and judgmental characteristics which render James Sr. hypercritical and unresponsive to any form of treatment. This pattern, according to Dr. Augenbraun presents an ongoing risk of abuse and neglect for these children, with a poor prognosis for change. In her opinion, James Sr.'s personality problems prevent any understanding of the needs of these children other than to ascribe their developmental limitations (if any) to their prematurity.
In Theresa's interview with Dr. Augenbraun on July 19, 1991 (State's Exhibit N.) she described herself as "very intelligent" (Id., p. 3.) while scoring "in the lower portion of the borderline range." (Id., p. 4). Dr. Augenbraun found Theresa regretful of her six year drug history, and although "motivated to maintain her abstinence at this time" (Id., p. 8), her personality disorder with immature, paranoid and impulsive features, combined with unrealistic aspirations and intellectual CT Page 4944 limitations, "may compromise her best efforts." (Id.) Her admission that she was not then ready to care for the children but might be some time in 1992 (Id. p. 6), Dr. Augenbraun found ". . . not acceptable in consideration of the special needs of the children and the harm that has already been done to them." She found it unlikely that Theresa "will at any time be capable of caring for all three children, due to her limitations and her personality." (Id. p. 8)
At trial, Dr. Augenbraun testified that Theresa had a greater potential for eventual adequate child care than did James Sr., but she could not predict rehabilitation sufficiently soon to meet the needs of any of her children within a time that they should be required to wait. Theresa means well, has changed some, but remains, according to Dr. Augenbraun, limited, immature, emotionally needy herself because of the lack of mothering in her own childhood. The psychologist concluded that all three children had a "critical" need for stable, nurturing permanent homes where they could focus on a single primary caretaker to meet all their needs. Prolonging their as status foster children, with its accompanying threat of removal at any time, for longer than the three years that has already passed, would only delay still further their normal development. While the children know who their parents are and can identify them as "Father" and "Mother", Dr. Augenbraun saw no constructive or useful role either parent could then, or in the future, play in their lives. In addition, she felt that Resa would be in danger of sexual abuse if placed with her father, while Princess was seen as needing a therapeutic foster home that could meet the special emotional demands of her continuing problems with wetting an soiling at the age of six. Even an ordinarily competent caretaker would not be able to meet Princess's special needs, and Theresa, when seen, still lacked the present ability to provide such care. Princess's problems are further exacerbated by her having been "parentified" before her removal to foster care. She would be predicted to revert to that role-highly destructive to her normal emotional development — if returned to a mother who is herself so emotionally deprived.
Although not offered as a new exhibit, the court takes judicial notice of an exhibit offered a year earlier during litigation initiated by the father's first motion to revoke commitment. (State's Exhibit 3, January 10, 1991). After evaluation in the Yale-New Haven Hospital Child Sexual Abuse Clinic, Julia Hamilton, Social Work Supervisor for the Clinic, concluded that, "Clearly, Princess has been touched by her father. [Sic. Meaning James Sr.] She had been very consistent with the story about touching. Therefore, I say that there are positive signs of sexual abuse by the father." While she found Resa and James to have been deprived and abandoned by their CT Page 4945 parents, they had never expressed verbally any sexual abuse. Since they had used no language whatever in the course of the evaluation, however, this was not conclusory of a negative finding.
— Social Worker Hubelbank was assigned this case in September of 1990 in the midst of the father's first revocation proceeding. In discussing the the twins' need for permanent placement, James Sr. had consistently denied that they had any special needs, denied sexually abusing any child, denied that anything had ever been wrong in the home despite the well-documented conditions on November 3, 1988. He accused the investigating police officers of going in and messing up his apartment looking for drugs. He flatly denied the presence of vomit, feces, roaches, or moldly food, or that Princess, at three, was being required to look after her twin half-siblings not yet two years old. Nonetheless, regular visitation with their father was permitted throughout this period. Eight months after receiving this case, Ms. Hubelbank initiated the instant termination action in order to implement the recommendation of various clinicians that these children all required permanent homes without further delay. Her plan was for the foster mother to adopt the twins, as recommended by Dr. Weber-Chess, and for a therapeutic foster home to be secured for Princess which, if willing, would be permitted to adopt. Such placement was in fact, secured during the pendency of this action and the specialized foster family, under whom Princess made dramatic gains in a few months, is willing to adopt. James Sr., while employed and in his own apartment, never acknowledged any failure of parenting on his part or any special needs of the twins before or after his various early attempts to secure recommended counselling. Theresa, also apparently unaware of the special needs of each child, had had no parent-child relationship since the twins were infants and Princess a two-year-old. She had never secured her own home and at the time of filing these petitions, was in a post-prison drug treatment program. Supervising visits with both parents, Ms. Hubelbank commented on the twins' extremely hyperactivity throughout all visits and the time it took to calm them down after visits.
— Psychologist Matthew Bowen, who evaluated Princess in June of 1991, and Gretchen Fox, Princess's therapist between March and August of 1991 both found evidence of her having been sexually abused. Princess's primary need was for placement in a foster home that could handle her special emotional needs, (which her first foster home of two years could not) and which she needed to know was permanent, (which that first home was not). Ms. Fox termed it "very critical" for Princess to have her placement issues resolved without more delay. Her awareness that her first foster home was not permanent and that that foster mother CT Page 4946 wanted her removed had been very stressful and anxiety-producing.
— Annette Ballou, special foster care coordinator for the Children's Center, testified that a family had been found that could meet Princess's needs and that would work in therapy with the child. Between her placement in that home in August of 1991 and the time of giving her testimony five months later (January 23, 1992), great progress had been made: The wetting and soiling which had continued for three years in the first foster home, had stopped altogether; she was calmer, less anxious, less "hyper", less clinging, less over-friendly with strangers. She loved her new foster parents, calls them "Mom" and "Dad", lets them parent her, listens to them, obeys them, accepts their discipline. During visits with her mother, Ms. Ballou detected no psychological bond between Princess and Theresa, although the child is aware of the biological connection. She is anxious to know she will never have to leave the present foster parents, and adoption by them was recommended without any further delay. If she were to be moved to a caretaker who lacked the education, patience, and time that the present foster home has made available to her, she would regress, and if a subsequent placement should fail, the effect on this fragile child would be "devastating".
— Princess's foster mother testified to the improvement in all areas in the five months the child lived with her. The child described episodes of sexual molestation by her stepfather (James Sr.), saying he had touched her genitals despite her protestations, and that she had cried because it hurt. Princess called her new foster parents "Mom" and "Dad" in the first week of her placement and although her nervousness and hyperactivity had significantly lessened, she remained confused about being able to stay in that placement indefinitely. According to the foster mother, Princess now "thinks it normal" to keep being moved from placement to placement.
Testifying on her own behalf on March 19, 1992 Theresa felt capable of caring for her children for the first time since their placement. She had been free of drug use for over a year (during incarceration and the subsequent drug program that ended in December of 1991). She had recently moved out of the home of a boyfriend and back in with her mother, and was expecting the birth of a fourth child at the time of testifying. While acknowledging cocaine addiction in the past and her inability to protect her children from James Sr. when living with him, she offered no evidence of any form of continuing treatment for her drug problem.
James Sr., on his own behalf, presented on February 6, 1992 no clinical witnesses to rebut the unanimous opinion of the CT Page 4947 expert witnesses called by DCYS that the improvement in the severely deprived state of the twins at the time of their removal from his care could only be sustained if they were permitted to stay in their foster home permanently. To counter this evidence, James Sr. (1) continued to deny any neglect in the conditions in which the twins were found in November of 1988 or any special needs they displayed at the time of their removal from his custody; (2) offered his own uncorroborated testimony as to the present stability of his life, which included taking in his home and supporting his eldest child — the daughter who, as a teenager, claimed he had sexually molested her for six years — and her three children: and (3) ascribed his failure to regain custody of his children to the failure of DCYS staff to work toward reunifying him with the children. He called no witnesses to support the first two of these defenses, and to support the third, he called his former attorney who testified that at unspecified times during her two-plus year representation of him, two DCYS social workers and one supervisor had stated that DCYS had no plan to reunify him with the twins. James Sr. also referred to exhibits offered in his prior unsuccessful revocation actions. These consisted of reports and evaluations from agencies to which he had been referred by DCYS in its early efforts to assist him in ameliorating the conditions which this court had determined to have been neglectful. (Father's Exhibit 2 offered June 12, 1990: letter from Ripple Program dated April 30, 1990; Exhibit 3 offered July 3, 1990; Psychological evaluation conducted April 30, 1990; Exhibit 4 offered July 3, 1990: Report from Family Services Woodfield dated May 18, 1990.) All of these were more than a year old when these petitions were filed, the most recent having been introduced on July 3, 1990, the day this court rejected his first revocation petition. James Sr. claimed that Theresa lied when she accused him of sexually molesting Princess, although admitting that the children could have been molested by others in his apartment while he was exercising custody. (The maternal aunt had earlier testified that before the children's removal, James Sr. had permitted many others to stay in his apartment, including substance abusers and known prostitutes.) He testified that he was maintaining employment as an aide with elderly nursing home patients, but that his real vocation was being ". . . called by God to call people to Jesus Christ", and while he was formerly a "social drinker", he had never used cocaine. Asked specifically about the conditions in which the children had been found in November of 1988, he responded that the children had ". . . had plenty clothes", that he could not recall their running around naked in the apartment. He did not think the conditions of that apartment were "so bad", admitting as his only lapse the possible failure to fold and put away clean clothes. On the day of their removal, he testified that he had only gone to the store for 5 to 7 minutes to buy CT Page 4948 Pampers, and when he returned, he had seen police and fire vehicles in front of the building. He did not explain, in his narrative testimony, why he had failed to reveal his presence to these authorities immediately, or why had he not contacted the state for a month after the children's removal. He also failed to explain how, when still living with his wife and supported by welfare, he had been able to buy a new car with cash — to provide, as he testified, "a nice station wagon for the kids" — which was later repeatedly damaged and finally abandoned. Social worker Hubelbank, recalled as the father's witness, acknowledged she had done nothing to reunify him with his children having received the case in September of 1990 after his first revocation petition had been denied and while his second, as well as the Yale evaluation of the sexual abuse allegations, was pending. By the end of January of 1991, the Yale report was received, confirming the sexual abuse of Princess, the father's second revocation petition in six months had been denied, and James Sr. was continuing to deny all problems of parenting and all special needs of the children. At that point the social worker admitted that no further efforts to reunite him with the twins were made, although his visitation rights were continued. She failed, however, to explain the four month delay in taking the first step toward an alternate permanent plan for these children by initiating this termination action.
Adjudication — On facts as of May 21, 1991 (date of filing these petitions):
The petitioner has established by clear and convincing proof that as of the adjudicatory date, both respondents, as parents of children previously found to have been neglected have ". . . failed to achieve such degree of personal rehabilitation as would encourage the belief that within a reasonable time, considering the age and needs of the child, they could assume a responsible position in the life of the child."
Theresa: In May of 1991, she was two months into a drug rehabilitation program, and had begun visiting her children after a full year in which there had been no contact of any kind with the children or their caretakers. At no time since the children's removal from home, or from the date of their commitment to DCYS 14 months later, had she had a home of her own or demonstrated the ability to avoid substance abuse for any sustained period of time outside of institutions. It could well be that her sobriety of over a year has broken the pattern of the past four or more years, and that some day she would be deemed stable enough to parent a child, but the statute requires that her level of rehabilitation must be able to "encourage the belief that within a reasonable time considering the age and needs of the child" she will be able to resume the parenting CT Page 4949 role (emphasis added). It is the child's needs, determined as of the adjudicatory date, and not the intent of the parent at that time that must guide a court in this situation:
 Under 17-43a [now 17a-112], however, the trial court's obligation is not to make an unguided investigation of the respondent's `fault' in determining whether to grant a petition to terminate parental rights, any more than its disposition is intended to reflect some kind of moral judgment respecting a parent whose rights are terminated . . . that criteria may in some instances implement the legislature's judgment that parental rights should be terminated despite the fact that a particular parent, with the best intentions, personally may be incapable of overcoming deficiencies in parenting skills.
In re: Luis C., 210 Conn. 157, 168-169 (1989)
James Sr.: The rejection of three prior revocation petitions between July of 1990 and May of 1991 is prima facie proof that the father has failed to rehabilitate since revocation would have been ordered had the court found "that cause for commitment no longer exists." (Subsection (g), 46b-129.) All of his apparent efforts to rehabilitate by engaging in counselling recommended by DCYS early in the twins' placement had terminated before the rejection of his first revocation petition in July of 1990, nearly two years before the adjudicatory date. No other efforts were made subsequently, and no change was discernible with the mere passage of time in his firm position that nothing had been wrong in November of 1988 either with the children or with his care of them. Photographs of children smiling during a recent visit (Father's Exhibit 2) do not contradict the evidence that their sexual acting out recurs after visits with him, or that the children were severely developmentally delayed, anxious and fearful during the early months of their placement. The fact that DCYS ceased further efforts to reunify the twins with their father after January of 1991 — which appears to be James Sr.'s principal argument against termination of his parental rights — does not preclude the granting of the relief sought by these petitions. Under existing law, termination petitions could have been filed at that time (January of 1991), more than two years after the twins' removal from his home and a year after their commitment. Certainly any effort toward reunification following confirmation that Princess had been sexually abused, a fact lending great weight to the suspicion CT Page 4950 that the twins, too, had been sexually abused as evidenced by their conduct, would have been clearly inconsistent with the children's best interests. The only administrative decision by DCYS that might be called into question is why there was any delay in initiating this action after January of 1991 when the father's second petition for revocation was rejected following receipt of the Yale report confirming sexual abuse.
A further ground exists for terminating Theresa's parental rights: For 12 of the 14 months preceding the filing of these petitions, there had been no contact of any kind between Theresa and the children. While visitation was temporarily suspended following her voiced threat to the physical well-being of the children, no request to resume visits, or to have visits conducted under more restrictive conditions, was received by DCYS. Indeed, Theresa's whereabouts were unknown between March of 1990 and January of 1991 when the social worker assigned to the case in September of 1990 met Theresa for the first time in a court hearing. At that time, Theresa revealed that she had been in Niantic for months, was about to be placed in drug treatment, and requested the reinstitution of visitation. This was granted, and since March of 1991 there have been monthly supervised visits which have gone without incident. As of the time these petitions were filed, however, there had only been two such visits in over a year. Theresa had not contacted DCYS upon her incarceration in mid-1990 to request visits at Niantic, nor had she made any effort to see or learn about any of the children for the period preceding that incarceration. While her interest in the children has been unflagging since the adjudicatory date of this action, this must be considered in the dispositional phase of this proceeding. As of the adjudicatory date, May 21, 1991, Theresa had clearly ". . . failed to maintain a reasonable degree of interest, concern or responsibility as to the welfare of the child[ren]."
The other two grounds pleaded for terminating parental rights must be dismissed:
1) The petitioner offered no evidence that any of the children had "been denied, by reason of an act or acts of parental commission or omission the care, guidance or control necessary for. . . [their] physical, educational, moral or emotional well-being" during the thirty months in which the children were in foster care before these petitions were filed. Under DCYS custody since November 3, 1988, they presumably were provided with all necessary care, and any omissions of such care would be the responsibility of the state, not the parents. The appalling conditions in which the children lived at the time of their removal were the basis for the adjudication of neglect in January of 1990; they cannot do double duty as the basis for CT Page 4951 termination of parental rights sixteen months later.
2) The plain language of the fourth ground set forth for terminating parental rights in subsection (b) of 17a-112
clearly applies to the facts found in this case: While the twins recognize James Sr. and Theresa as their parents, and Princess knows Theresa is her mother, the relationship that exists between them, at best that of children with friendly but infrequent family visitors, cannot be considered a "relationship that ordinarily develops as a result of a parent having met on a day to day basis the physical, emotional, moral and educational needs of the child," the definition of "ongoing parent-child relationship" set forth in the statute. Theresa had neither obligation nor right to provide such needs subsequent to the vesting of sole custody in James Sr. by the Probate Court three full years before these petitions were filed. And while James, Sr. had been caring for the children prior to November 3, 1988, facts learned at the time of their removal and subsequent to their placement in foster care raises a real question as to whether he had ever adequately met the physical, emotional, moral or educational needs of the twins. All of the clinical witness called by the state were unanimous in recommending immediate determination of a permanent home for each child as the most urgent necessity for their normal development. Given James Sr.'s inflagging insistence that nothing was ever wrong with his care of his children or with their developmental progress, and given the very recent and fragile nature of Theresa's recovery from years of drug abuse, it is clear that to allow further time for the establishment or reestablishment of such parent-child relationship would be detrimental to the best interest of the child[ren]." This plain language, however, has been substantially altered by recent judicial interpretation which precludes finding this ground where there is any evidence of positive feelings, memories or ties with the natural parent. In re: Jessica M., 217 Conn. 459 (1991). All of the children know who their mother is and have no seriously negative response to her recently resumed visits. The twins know that James Sr. is their real father and interact appropriately during monthly visits. While it is doubtful that they have present memories of the time when they were than two years old, living with him in the chaos of the home he was providing in November of 1988, his persistent visitation since that time has created an emotional tie that is not wholly negative. Consequently it cannot be found, by the requisite clear and convincing proof, that this ground exists as to either parent, notwithstanding the unquestionable applicability of the statutory language to the facts found at trial.
Dispositional — On facts as of March 19, 1992, the final day of trial. CT Page 4952
In the ten months between the adjudicatory date and the final day of trial, Theresa's situation, by her unsupported account, continued to improve. She completed the drug treatment program in December of 1991 and has stayed drug free since that time. She has moved frequently, but was living with her mother as of the final date of trial in order to save money for a place of her own which she has had at no time since these children were placed in 1988. She is pregnant by a man with whom she is no longer involved. She has maintained regular visitation since March of 1991. The situation of James Sr. is as unchanging as it was in the first three years of the twins' placement: While he is currently maintaining employment and an apartment in his own name, he is engaged in no form of counselling and evidences no improved understanding of his failings as a caretaker or the negative impact those failings had had upon his children from the counselling that did take place prior to July of 1990.
Before a parent's rights may be terminated, however, the court must consider the six factors set forth in subsection (d) of 17a-112:
1) No services could be offered to the mother to facilitate reunion with her children when she was whereabouts unknown or incarcerated. When her whereabouts became known in January of 1991, monthly visits were begun. Since she was then involved in a drug treatment program, referrals from DCYS were not necessary in order for her to address the major cause for losing custody of these children. Multiple services were offered to James Sr. at the outset of the twins' placement, but he had discontinued all by the summer of 1990, and no improvement in his ability to meet the children's needs was evidenced by the counselling that did take place.
2) No court orders were entered into this case except for court appearances and cooperation with ordered evaluations. Both parents attended court, and Theresa cooperated with the evaluations by Dr. Augenbraun; James Sr. missed two out of three scheduled visits with the evaluator for reasons that did not appear to be convincing.
3) The twins are clearly firmly bonded to their foster parent of the last three and one-half years; removal from her care would have only negative impact upon them according to the unrefuted opinion of several qualified expert witnesses. Princess, whose problems are emotional rather than intellectual or developmental, has made enormous progress since placement in a therapeutic foster home in August of 1991. The family is willing to keep her permanently. Her need for permanency with a nurturing family with a proven capacity to meet her special CT Page 4953 needs for clear limit-setting and emotional bonding surpasses all of her other needs at the present time. In the case of all three children, while parental visits are uneventful, negative behaviors have been observed following visits and none of the children speak of their parent between visits or ever voice a desire to live with them. None of the expert witnesses found any benefit to the children from continued parental contact.
4) Princess, at seven, and the twins, now five, have spent half or more of their lives in foster care. After three and one-half years of placement, neither parent has yet demonstrated the ability to provide them with adequate care, and neither is predicted to be able to do so within a period of time that the children can afford to wait. Before entering latency age, each of these children deserves the assurance of permanency in homes of proven ability to nurture.
5) In the first two years of their placement, James Sr. made a number of apparent efforts to adjust his circumstances to make it in the best interests of the twins to return to his care: He briefly attended several programs designed to assist him in parenting, but persevered with none and showed no change in parenting ability as a result of this involvement. All such involvement had ended for a year and a half before the dispositional date of this case. Theresa made no effort for the first two years of their children's placement to change any of her circumstances and, unlike James Sr., she failed to maintain regular contact with the children. For the third year, beginning in early 1991, she persevered with drug treatment and resumed regular visits, but she was only released from stipulated treatment in December of 1991, and since that time has not been involved in any drug treatment program, has not secured her own housing, and has become pregnant by a man with whom she is no longer involved. Whether she can maintain her present sobriety and freedom from criminal involvement only time can tell, and her children have by now run out of time.
6) All restrictions placed upon visitation by both parents were dictated by the needs of the children as determined by qualified professionals. Such restrictions were therefore, not unreasonable, nor were they dictated in anyway by the economic circumstances of either parent.
Having considered the foregoing, persuaded by the unequivocal and unrefuted testimony of nine expert witnesses, it is found by clear and convincing proof to be in the best interests of each of these children for their parents' rights to be terminated so that they may know at last the security of permanent homes with caretakers of proven ability to meet their CT Page 4954 special needs. Therefore, it is ORDERED that the parental rights of Theresa J. in and to her daughter, Princess, and the parental rights of Theresa J. and James J. Sr. in their twins, Resa and James Jr., be and hereby are terminated. And it is further ORDERED that the Commissioner of DCYS be appointed statutory parent for the purpose of placing these children forthwith in adoption, and to secure that end it is further ORDERED that said commissioner file with this court no later than 90 days after the date of this judgment a written report as to the progress toward such adoption. If adoption is not finalized for any or all of these children by September 1, 1993 a Motion to Review Plan for Terminated Child must be filed by that date to ensure judicial review no later than eighteen months after the date of this judgment, as required by law.
Entered at Bridgeport this 22nd day of May 1992.
FREDERICA S. BRENNEMAN, JUDGE